[No. 64929-9-I.   Division One.   March 5, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT SAQUIL BESABE, *Appellant*.

■■■■■■■■

■■■■■■■■

*Robert Saquil Besabe*, pro se.

*Nancy P. Collins* (of *Washington Appellate Project*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Ann M. Summers, Deputy*, for respondent.

---

■■■■■■

■■■■■■■■

■■■■■■■■

---

¶1 LEACH, A.C.J. — Robert Saquil Besabe appeals his convictions for one of two counts of first degree murder and one count of attempted first degree murder. Primarily, he contends that the first degree murder statute does not apply to one victim, a child not born until after Besabe shot the mother. He also claims that the court improperly instructed the jury and commented on the evidence. Finally, Besabe argues that the court erred by responding to a jury question without first consulting defense counsel. Because we determine the status of a murder victim at the time of death and not when the defendant commits the homicidal act and find no merit in Besabe's other assignments of error, we affirm.

## FACTS

¶2 Sometime around January 1982, Eleanor Velasco ended a dating relationship with Robert Besabe. Several months later, she moved in with a friend from work, Carolina Montoya. Besabe felt that Montoya's friendship caused Velasco to end their relationship. In addition, he disapproved of the fact that Montoya was carrying a baby fathered by an African American.

¶3 On the afternoon of August 16, 1982, Montoya picked Velasco up from work. While driving their usual route home, the women saw Besabe standing on the side of the road. Thinking that Besabe might have car trouble, Montoya stopped to ask if he needed a ride. He got into the backseat of Montoya's car and gave her driving directions. After driving for 10 to 15 minutes, Besabe told Montoya to stop the car. Velasco pulled the passenger seat forward to let Besabe get out. Besabe pulled a pistol and shot Montoya once in the head. Then he fired a shot aimed at Velasco's head and left the vehicle. Velasco thought the shot struck her, but it missed.

¶4 Paramedics took Montoya to Harborview Medical Center, where doctors delivered Baby Boy Montoya by an emergency cesarean section. Medical personnel estimated his gestational age at 30 to 32 weeks. Baby Boy Montoya lived two days before dying of complications from premature birth.[1] Carolina Montoya died approximately six weeks later.

¶5 After the shooting, Besabe fled Washington, eventually returning to the Philippines where he was born. In December 2007, the State extradited Besabe to Washington to stand trial. A jury convicted him of the first degree murders of Carolina and Baby Boy Montoya and first degree attempted murder of Eleanor Velasco. Besabe appeals.

## ANALYSIS

¶6 Besabe raises multiple issues on appeal: (1) whether Baby Boy Montoya was a "person" who could be the victim of first degree murder, (2) whether the court should have instructed the jury to decide if Baby Boy Montoya was a "person," (3) whether the court commented on the evidence

---

[1] At trial, in 2008, the retired medical examiner testified that given advances in medical technology, the baby would likely have survived if the shooting had occurred today.

with instructions that assumed Baby Boy Montoya was a "person," (4) whether the court incorrectly instructed the jury regarding transferred intent, (5) whether the court erred by responding to a jury question without consulting counsel, and (6) whether the court incorrectly instructed as to the elements of attempted first degree murder.

¶7 Besabe first contends that Baby Boy Montoya could not be a murder victim because he was not a "person." A homicide is the killing of a human being, and murder is one of five defined ways to commit a homicide in Washington.[2] As charged in this case, "[a] person is guilty of murder in the first degree when . . . [w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person."[3] The criminal code does not define "human being" but defines "person" as "any natural person and, where relevant, a corporation, joint stock association, or an unincorporated association."[4] It does not provide any definition for "natural person." Thus, a murder victim must be a human being and a natural person. Although not statutorily defined, in the context of this analysis these two terms are synonymous. Because Baby Boy Montoya was not born until after Besabe shot his mother and died two days later from complications of his premature birth, Besabe claims he was not a natural person.

¶8 The meaning of a statute is a question of law that we review de novo.[5] "In the absence of a specific statutory definition, words in a statute are given their common law or ordinary meaning."[6] Additionally, RCW 4.04.010 provides,

---

[2] RCW 9A.32.010.

[3] RCW 9A.32.030(1)(a).

[4] RCW 9A.04.110(17).

[5] *Baum v. Burrington*, 119 Wn. App. 36, 39, 79 P.3d 456 (2003).

[6] *State v. Chester*, 133 Wn.2d 15, 22, 940 P.2d 1374 (1997).

The common law, so far as it is not inconsistent with the Constitution and laws of the United States, or of the state of Washington nor incompatible with the institutions and condition of society in this state, shall be the rule of decision in all the courts of this state.

¶9 The common law follows the "born alive" rule that

"prescribes that only one who has been born alive can be the victim of homicide. Causing the death of a fetus, whether viable or not, was not considered homicide at common law. If, however, the fetus was born and then died of injuries inflicted prior to birth, a prosecution for homicide could be maintained."[7]

The overwhelming majority of jurisdictions confronted with the prosecution of a defendant for conduct harming a pregnant mother, causing the death of the subsequently born child, affirm the defendant's conviction.[8] No Washington criminal case adopts or applies the "born alive" rule. Following the dictate of RCW 4.04.010, we adopt this majority common law rule. This means that we determine whether Baby Boy Montoya was a person as of the time he died, not when Besabe shot his mother.

¶10 Uncontroverted evidence established that Baby Boy Montoya was born prematurely after the attack on his mother. He survived for nearly two days. Therefore, as a matter of law, he was a "person" for purposes of the first degree murder statute.[9]

¶11 Besabe relies on *State v. Dunn*[10] to support his argument that the murder statute does not apply to harm inflicted on an unborn child. In *Dunn*, the State charged a mother with second degree criminal mistreatment of her unborn child for using cocaine during pregnancy. Specifi-

---

[7] *State v. Courchesne*, 296 Conn. 622, 675, 998 A.2d 1 (2010) (quoting *Commonwealth v. Booth*, 564 Pa. 228, 240, 766 A.2d 843 (2001)).

[8] *State v. Aiwohi*, 109 Haw. 115, 123, 123 P.3d 1210 (2005).

[9] *See Courchesne*, 296 Conn. at 675.

[10] 82 Wn. App. 122, 916 P.2d 952 (1996).

cally, the State asserted that Dunn recklessly disregarded her doctor's warnings, ingested cocaine, and by this conduct created an imminent and substantial risk of death or great bodily harm to her unborn child.[11] The trial court dismissed the charge, holding that an unborn child was not within the class protected by the criminal mistreatment statute. Division Three of this court agreed. After noting that the legislature defined "child" as "a person under eighteen years of age,"[12] the court stated, "No Washington criminal case has ever included 'unborn child' or fetus in its definition of person."[13] It also observed that when the legislature intends to include an unborn child within a class of criminal victims, it specifically includes language to indicate a departure from "the typical definition of a child as a person from the *time of birth* to age 18."[14]

¶12 *Dunn*'s analysis does not apply here because the criminal mistreatment statute differs significantly from the murder statute. The elements of second degree criminal mistreatment of a child include proof that the defendant caused substantial bodily harm by withholding the basic necessities of life from a child. Thus, the language of the charging statute in *Dunn* required both that the wrongful act be committed against a child and that the child have suffered harm.[15] Because the victim in *Dunn* was not a child at the time of the wrongful act, the criminal mistreatment statute did not apply. In contrast, the murder statute does not have this dual requirement for the victim. To commit first degree murder, a person, with a premeditated intent to cause the death of another person, must cause the

---

[11] *Dunn*, 82 Wn. App. at 124-25.

[12] RCW 9A.42.010(3).

[13] *Dunn*, 82 Wn. App. at 128.

[14] *Dunn*, 82 Wn. App. at 128-29 (emphasis added).

[15] Former RCW 9A.42.030 (1986).

death of that person or of a third person.[16] In other words, the statute defining "first degree murder" requires only that the victim be a person at the time of death and not at the time the defendant commits a homicidal act. This is consistent with the common law "born alive" rule.

¶13 Besabe next contends that the trial court should have submitted the question of whether Baby Boy Montoya was a person to the jury for decision. As presented in this case, this question is one of law and not one of fact. Both at trial and before this court, Besabe did not dispute any facts essential to determining if Baby Boy Montoya could be a murder victim. Instead, Besabe has always asserted the issue to be whether this is determined as of the time of his alleged homicidal act or the time of Baby Boy Montoya's death. This presents a question of law to be decided by the court and not a question of fact to be decided by a jury. Therefore, we reject Besabe's contention that the trial court should have instructed the jury to decide whether Baby Boy Montoya was a person.

¶14 Besabe next contends that the trial court commented on the evidence when it instructed the jury. The "to convict" instruction for the first degree murder count for Baby Boy Montoya required proof that "the defendant acted with intent to cause the death of Baby Boy Montoya or a third person" and that "Baby Boy Montoya died as a result." Besabe claims that with this instruction the court resolved the factual question of whether Baby Boy Montoya was a person and prevented the jury from deciding factual questions, "including how he was born, what his physical condition was, what caused his death, [and] whether the medical examiner reporting on the physical condition at the time of birth was accurate and credible."

¶15 Article IV, section 16 of the Washington State Constitution provides, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall

---

[16] RCW 9A.32.030(1)(a).

declare the law." This provision prohibits a judge from "conveying to the jury his or her personal attitudes toward the merits of the case" or instructing a jury that "matters of fact have been established as a matter of law."[17] The court's personal feelings on an element of the offense need not be expressly conveyed; it is sufficient if they are merely implied.[18] "Thus, any remark that has the potential effect of suggesting that the jury need not consider an element of an offense could qualify as judicial comment."[19] Because the constitution expressly prohibits any judicial comment on the evidence, a claimed error based upon such a comment involves a manifest constitutional error that may be challenged for the first time on appeal.[20]

¶16 The pattern jury instructions for first degree murder permit a court to instruct in exactly the manner that the trial court instructed the jury.[21] At trial, Besabe did not dispute that Baby Boy Montoya was a person on the day he died. Besabe questioned only whether Baby Boy Montoya's capacity to be a murder victim should be determined as of the time of the shooting or the time of Baby Boy Montoya's death. Under these circumstances, the court's instruction did not comment on the evidence.[22] Even if the instruction arguably did comment on the evidence, the record affirmatively demonstrates that no prejudice could have resulted.

¶17 Retired King County Medical Examiner Donald Reay testified as to the circumstances of Baby Boy Montoya's birth, death, and cause of death. Besabe did not challenge or question this witness's credibility on these

---

[17] *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997).

[18] *State v. Jackman*, 156 Wn.2d 736, 744, 132 P.3d 136 (2006).

[19] *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006).

[20] *Levy*, 156 Wn.2d at 719-20.

[21] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 26.02, at 361 (3d ed. 2008).

[22] *Levy*, 156 Wn.2d at 722.

subjects at any time in any manner. The trial court's instructions required the jury to find that Baby Boy Montoya died as a result of Besabe's acts. No reasonable juror could have decided that Baby Boy Montoya was not a person at the time of his death.

¶18 Besabe also contends that the trial court erred by providing conflicting instructions as to which charges transferred intent applied. "[J]ury instructions are sufficient when, read as a whole, they accurately state the law, do not mislead the jury, and permit each party to argue its theory of the case."[23] This court reviews de novo whether a jury instruction correctly states the applicable law.[24]

¶19 Midway through the State's closing argument, the deputy prosecutor proposed several changes to the jury instructions to clarify the prosecution's theory of transferred intent. Defense counsel made a general objection but, when questioned about possible prejudice, conceded her objection related to adding language to the second degree murder instruction (instruction 26).[25] She did not object to the proposed change to the transferred intent instruction (instruction 15), which the prosecutor asked to clarify to inform the jury that it applied only to the murder charge for the baby's death. She did not object later, when the judge decided that instead of changing instruction 15, he would give a new transferred intent instruction, instruction 30. She did not object when the judge gave the new transferred intent instruction without striking the original instruction on that issue. Thus, Besabe did not preserve the specific error now alleged—that the two instructions on transferred intent were contradictory and potentially confusing. Be-

---

[23] *State v. Teal*, 152 Wn.2d 333, 339, 96 P.3d 974 (2004).

[24] *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995).

[25] Counsel argued that changing this instruction potentially altered the theory of the case and might necessitate changing the closing argument she had prepared.

cause he did not preserve the alleged error for review[26] and makes no claim of manifest constitutional error,[27] we decline to consider the issue.

¶20 When a jury asks questions during deliberations, the court "shall notify the parties of the contents of the questions and provide them an opportunity to comment upon an appropriate response."[28] This rule has both state and federal constitutional underpinnings in the defendant's right to be present at all critical stages of trial, including the court's handling of jury inquiries.[29] During deliberation, the jury questioned the potential contradictions between instructions 15 and 30. While the original trial record did not reflect whether the judge consulted with counsel before answering the question, the judge later met with counsel and entered an agreed report of proceedings, which states that the trial judge called the parties before responding but also states that neither the court nor counsel have a specific recollection of the conversation.

¶21 Besabe now argues that the agreed report of proceedings does not settle the record because none of the parties expressed a clear memory of the event. However, even if the court failed to consult counsel before answering the inquiry, we must also decide if the error was harmless beyond a reasonable doubt.[30] In general, a court's response to a jury inquiry will be deemed harmless if it conveyed no affirmative information.[31] The court's written response here said, "Please follow all of the instructions, including

---

[26] See State v. Guloy, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985).

[27] RAP 2.5.

[28] CrR 6.15(f)(1).

[29] State v. Ratliff, 121 Wn. App. 642, 646, 90 P.3d 79 (2004).

[30] Ratliff, 121 Wn. App. at 646.

[31] See State v. Allen, 50 Wn. App. 412, 419, 749 P.2d 702 (1988) (jury told to read instructions and continue deliberations).

instruction 30." Because the judge's response conveyed no affirmative information to the jury, it was harmless error.[32]

¶22 Finally, Besabe argues that the "to convict" instruction for attempted first degree murder omitted premeditated intent as an essential element of the crime charged. The State responds that the instruction included the essential elements: (1) that Besabe intended to commit first degree murder and (2) that he took a substantial step in committing first degree murder.

¶23 In *State v. Reed*,[33] Division Two affirmed a conviction for attempted first degree murder based on a "to convict" instruction that stated, " '[T]he defendant did an act which was a substantial step toward the commission of Murder in the First Degree' " and " '[t]hat the act was done with the intent to commit Murder in the First Degree.' " Reed, like Besabe, argued that "the trial court's failure to include the premeditation element in the 'to convict' instruction, even though [the Washington Pattern Jury Instruction] does not require it, constitutes error."[34] The court in *Reed* noted that this argument "conflates the intent necessary to prove an attempt with that necessary to prove first degree murder."[35] Because the State did not charge Reed with completed first degree murder, "the State was not required to prove that Reed acted with premeditated intent to commit murder, only that he attempted to commit murder."[36]

¶24 Here, like in *Reed*, count IV charged Besabe with attempted first degree murder or attempted second degree murder as a lesser included offense. The jury instructions correctly stated that to convict Besabe, the prosecution

---

[32] *Allen*, 50 Wn. App. at 419.

[33] 150 Wn. App. 761, 771-72, 208 P.3d 1274 (2009).

[34] *Reed*, 150 Wn. App. at 772.

[35] *Reed*, 150 Wn. App. at 772.

[36] *Reed*, 150 Wn. App. at 772-73.

needed to prove "the defendant did an act which was a substantial step toward the commission of Murder in the First Degree of Eleanor Velasco [and t]hat the act was done with the intent to commit Murder in the First Degree." The trial court did not err in giving the instruction.

## CONCLUSION

¶25 For the reasons stated, we affirm Besabe's convictions for two counts of first degree murder and one count of attempted first degree murder.

GROSSE and APPELWICK, JJ., concur.

Reconsideration denied April 5, 2012.

Review denied at 175 Wn.2d 1003 (2012).